**GENERAL TIRE & RUBBER COMPANY, Plaintiff,**

v.

**JEFFERSON CHEMICAL COMPANY, INC., Defendant.**

**No. 68 Civ. 1227.**

United States District Court,
S. D. New York.

Sept. 5, 1973.

See also, D.C., 50 F.R.D. 112.

Watson, Leavenworth, Kelton & Taggart, New York City, for plaintiff; John T. Kelton, Herbert Blecker, James W. Badie, New York City, Frank C. Rote, Akron, Ohio, of counsel.

Coffee & Sweeney, Chicago, Ill., for defendant; James R. Sweeney, J. Robert Stapleton, Louis A. Hecht, Chicago, Ill., Carl G. Ries, Houston, Tex., of counsel.

Kane, Dalsimer, Kane, Sullivan, Kurucz & Goldstein, New York City, for defendant; David H. T. Kane, John Caslin, New York City, of counsel.

ROBERT L. CARTER, District Judge.

## OPINION

This action, brought on by plaintiff, General Tire & Rubber Co. (hereinafter called "General" or "plaintiff"), seeks judgment pursuant to 28 U.S.C. §§ 2201 and 2202 declaring certain claims in United States Patent #3,102,875, issued on September 3, 1963, to Herbert Heiss (hereinafter called "the Heiss patent"), now assigned to defendant, Jefferson Chemical Co. (hereinafter called "Jefferson" or "defendant"), invalid under 35 U.S.C. §§ 102(e), 102(g), 103 and 112. General alleges, in addition, that these claims are not the invention of Mr. Heiss; that they constitute late claims and should not be protected from the date the application itself was filed in the Patent Office but only from the date when the claims were added as amendments to the application; that the claims are invalid for double patenting and that the agreement under which Jefferson acquired title to the patent violates public policy. Plaintiff concedes that if the validity of the patent is upheld, it has infringed the claims in question. Jefferson counterclaims for injunctive relief barring further infringement, for an accounting, costs and attorneys' fees. Jurisdiction exists over the subject matter and the parties pursuant to 28 U.S.C. § 1400(b).

*Background Facts:*

Plaintiff is an Ohio corporation with its principal place of business in Akron, Ohio. It is engaged, *inter alia*, in the business of manufacturing and selling polyurethane foam products, and since 1964 has manufactured and sold over 100 million pounds of polyether urethane foam. Defendant, a Delaware corporation, maintains offices and is qualified to do business in New York.

The patent in controversy has been assigned to defendant pursuant to agreement between Mobay Chemical Corporation and defendant. This agreement provides that Jefferson use all reasonable efforts within not less than two years from the date of the agreement to secure at least one manufacturer of polyoxyalkylene polyether polyols as a nonexclusive licensee under the Heiss patent pursuant to terms providing for royalty payments of not less than $200,000 within a period of five years from the effective date of the license; moreover, defendant is required to make available licenses to additional polyoxyalkylene polyether polyol manufacturers on similar terms or on conditions requiring the payment of higher royalties; Jefferson is obligated to pay Mobay 40% of whatever funds it receives pursuant to such licensing and the Heiss patent is to be reassigned to Mobay at the end of the two-year period unless at least one license has been granted, or Jefferson has filed at least one complaint in a United States District Court charging at least one party with infringement.

Pursuant to the above agreement Jefferson, on January 25, 1968, having failed to obtain the licensee required, instituted an action against General in the Northern District of Illinois for infringement of the Heiss patent (Civil Action 68 C 150). On March 23, 1968 General filed the instant action in this court, and thereafter the Illinois litigation was voluntarily dismissed.

*The Heiss Patent:*

The patent in question involves processes for making various polyurethane products such as adhesives, sealants, protective coatings and foams. The process for making foams by reacting a condensate of propylene oxide and a polyol such as pentaerythritol having three or four hydroxyl groups with an excess of diisocyanates, is the invention with which this controversy is concerned.

*The File Wrapper History of the Prosecution of The Heiss Patent in the United States Patent Office:*[1]

The application which was to become the Heiss patent had a very rough time progressing through the Patent Office. It was filed on August 7, 1953, in the name of James H. Saunders and Herbert L. Heiss as an invention of "Novel Resinous Compositions and Methods of Producing Same". It emerged some ten years later as U.S. Patent #3,102,875 under Heiss' name alone and as an invention of "Polyurethane Reaction Product and Method For Making Same." The first four pages of the initial application which was part of the file wrapper, admitted as an exhibit in this case, reads substantially the same as columns 1, 2 and through line 12 of column 3 of the patent as finally issued. In short, the invention described in the initial application as that of Saunders and Heiss bears, at least in part, the same description as the invention which, as patented, is attributed solely to Heiss. It should be added that Jefferson asserts in its post-trial brief that the specifications in the Saunders-Heiss application and those in the Heiss patent as issued are the same, and this assertion has not been controverted.

All claims in the initial application were rejected as unpatentable over various cited references [2] in a determination dated April 8, 1954,[3] addressed to Saunders. New claims were then added on October 7, 1954,[4] and again all claims were rejected—this time in a communication to Saunders dated October 25, 1956, and in this communication a newly cited reference was named as rendering the application unpatentable.[5]

Further amendment was made on March 12, 1957, and once again all claims were rejected in a communication dated July 31, 1957. This determination contained newly cited references not mentioned in either of the prior rejections. A new amendment was filed on January 27, 1958, which was deemed an incomplete response. Further amendment was thereafter filed on February 17, 1958. On October 2, 1958, all claims were rejected as final over cited added references, including citations to Vol. 57 of Chemical Engineering. Further amendment was then filed in an effort to persuade the examiner to reconsider his final rejection.

Then, on December 10, 1958, patent #2,866,774 (hereinafter the "Price Patent") entitled "Polyether Polyurethane Rubber" was issued to Dr. Charles Price. On learning of this patent a new amendment to the Saunders-Heiss appli-

1. Each of the parties has filed as exhibits copies of portions of the file wrapper in the prosecution of the Heiss patent and the Price-Heiss interference. My assumption is that the portions furnished were those claimed by each party to be relevant to its contentions and that whatever has not been filed has no bearing on the issues at stake in this proceeding.

2. Since the cited references are not claimed here as prior art, they will not be identified.

3. The file wrapper containing action by the Patent Office usually bears a stamped date showing when the document was mailed from the Patent Office. This is the date usually referred to here as the date a determination was made by the Patent Office.

4. Where an amendment or other papers have been filed by the parties, I have sometimes used the date placed on the document by the patent attorneys, rather than the date stamped on by the Patent Office when the document was received. Neither in terms of chronology, clarification nor in any other respects do differences in these dates seem critical to this controversy.

5. Again, since the cited reference is not claimed here as prior art rendering the patent invalid, it has been omitted.

cation was filed on February 4, 1959, in which certain claims in the Price patent were copied and made a part of the Saunders-Heiss application, and the examiner was requested to declare an interference between the Price patent and the Saunders-Heiss application.[6] On March 5, 1959, certain of these claims were rejected as unpatentable over newly cited references, but the examiner suggested a reformulation of certain of the claims and indicated if so reformulated, the claims might be allowed. The suggested reformulation was filed as an amendment on March 24, 1959, and an interference between Price and Heiss was declared on July 21, 1959.

In September 1959, Saunders and Heiss filed a petition with supporting affidavits requesting that their application be converted from Saunders-Heiss as joint inventors to Heiss as sole inventor, on the ground that the only remaining claims were those on which Heiss alone had worked. The conversion was granted on December 23, 1959.

Further amendment to the application followed on April 29, 1960, with the addition of four claims. On August 13, 1962, U.S. patent #2,948,691, issued to Erwin Windemuth, Herman Schnell and Otto Bayer (hereinafter referred to as the "Windemuth patent")[7] was cited as an additional reference, and the final rejection of October 2, 1958, was withdrawn. The allowed claims were rewritten as an amendment on September 17, 1962, and on October 12, 1962, certain of the claims were rejected and others allowed. At some point after Saunders' name was removed from the application, the title was changed and on September 3, 1963, the patent issued.

## The Price-Heiss Interference:

Dr. Charles Price had filed his patent application on September 23, 1953, approximately six weeks subsequent to the filing date of the Saunders-Heiss application. The Price patent calls for a polypropylene oxide condensate having a molecular weight of 600 or more to react with an excess of diisocyanates. The interference was allowed to go forward on the arguable thesis that Heiss' claims necessarily encompassed Price's claims because, while the former had placed no stress on molecular weight limitation, the polypropylene oxide condensate which was basic to the Price patent and Heiss application inherently had a molecular weight limitation of 600 or more.

Dr. Price, in an affidavit filed in the course of the interference, gave January 1949, as his date of conception and April 1949, as the date of reduction to practice. Mr. Heiss gave November 14, 1951 as the date of conception.[8] Dr. Price was thus contending entitlement to priority over Heiss on the basis of prior conception and prior reduction to practice.

Dr. Price filed a motion to dissolve the interference, arguing that the polypropylene oxide condensate in question could vary all over the lot in respect of molecular weight, depending upon the process followed and reaction conditions, and that a molecular weight of 600 is not inherently obtained, citing Sokol, U. S. patent #2,527,970 (here urged as prior art), as a reference in support of this thesis. Moreover, Price argued, Heiss' process necessitated the presence of a plasticizer while his did not.

On August 15, 1960, the examiner denied the motion to dissolve on the

6. As I understand the procedure, Saunders and Heiss were asserting, by copying the Price claims, that the Price patent and their application were to the same invention, and since their application had been filed before that of Dr. Price, that their application should be accorded priority: in effect, that the issuance of the Price patent should be rescinded, and a patent issued to them.

7. This Windemuth reference is the one on which plaintiffs chiefly rely as prior art rendering the Heiss patent invalid for "obviousness".

8. The Heiss affidavit does not disclose the date of reduction to practice, but during the course of the interference and in these proceedings, he introduced testimony seeking to establish that date as September 19–22, 1952.

ground that nothing in the disclosure in the Price patent showed that the condensate with a molecular weight limitation below 600 would not yield the same result as one with the molecular weight limitation his invention required. He also found that nothing in the specifications in the Heiss application necessitated the presence of a plasticizer and concluded that the language used made clear that the presence of a plasticizer was not critical. On October 3, 1960, in denying a motion to reconsider his denial of the motion to dissolve the interference, the examiner pointed out that he had taken cognizance of the Windemuth patent, which, as indicated previously, is urged here as prior art.

The issue was taken to the Board of Patent Interference. There, as he had done before the examiner, Price stressed prior conception and reduction to practice and asserted that a molecular weight limitation of 600 was critical to his invention and that the polypropylene oxide condensate in question disclosed in both his patent and in the Heiss application would not inherently yield a molecular weight of 600.

The Board of Interference held that Heiss was in no way concerned with the molecular weight of the condensate required for his invention; that it was clear that the condensate disclosed in his application, when prepared in accord with the teachings of prior art, would be sufficient to meet his require-

ments without regard to molecular weight; and that Heiss' claims had been triggered by knowledge of the Price patent.[9] On the other hand, the Board concluded that the Price patent established that the condensate there disclosed must have a molecular weight of at least 600 in order for his invention to be successfully practiced. It held that while the Heiss claims were subject to no such limitations and were broader than the claims made by Price, *"the fact that a broad claim embraces the subject matter of a narrower one does not, in itself, establish that the two are drawn to the same invention"*, citing Andrews v. Wickenden, 194 F.2d 729 (C.C.P.A. 1952), and Emerson v. Beach, 215 F.2d 290 (C.C.P.A.1954) (emphasis supplied). The Board decided that the Price claims with the molecular weight limitation, therefore, *"are not for the same invention"*, and priority of invention in the subject matter in issue in the interference was awarded to Price (emphasis supplied). The Board did not deal with any of the other questions raised.[10] No appeal was taken by Heiss from that decision.[11]

*The Issue of Prior Art:*

Plaintiff relies chiefly on the Windemuth patent as prior art rendering The Heiss patent invalid; in the alternative, it contends that Windemuth, an article by Dr. Otto Bayer, published in this country in 1947, U.S. patent #2,527,970 issued to Herman Sokol in 1960, and the

---

9. I read this as referring to Heiss' emphasis on molecular weight of the condensate as being inherently 600 or more. The Board could mean no more than that since, as I understand it, in an interference the claims of one party are literally copied by the party seeking the interference to show that his claims and those of the other party go to the same invention.

10. It should also be mentioned that the Price patent cites Hill, U.S. Patent #2,726,219 (Hill patent) as a reference, on which plaintiff also relies here as prior art.

11. I have deliberately set forth the file wrapper history of the prosecution of the Heiss patent and of the Price-Heiss inter-

ference at some length. Varying degrees of weight are attached by the courts to the action of the Patent Office. In this proceeding, I must determine *de novo*, independent of the Patent Office action, the validity of the patent in question, but where, as here, some of the same contentions are being made and issues raised which were raised and decided in proceedings in the Patent Office, Judge Mansfield's admonition in The Ansul Company v. Uniroyal, Inc., 301 F. Supp. 273, 280 (S.D.N.Y.1969), modified on other grounds, 448 F.2d 872 (2d Cir. 1971), cert. denied, 404 U.S. 1018, 92 S.Ct. 680, 30 L.Ed.2d 666 (1972) that "it is unrealistic to attach any great weight to the allowance of a patent by an overworked staff [in the Patent Office]" seems wholly inapposite.

Hill patent, #2,726,219, issued in 1955, collectively constitute prior art rendering the Heiss patent invalid for obviousness. Defendant contends that none of these teachings taken together or separately constitute prior art to the Heiss patent. For reasons to be discussed below, I reject the arguments of both parties.

Dr. Bayer was, I gather, if not the father, one of the earlier inventive geniuses of the polyurethane industry which had its beginnings in Germany in 1937 with the development of polye, ter based urethanes. Bayer's great contribution was the teaching of a method of cross linking by use of diisocyanates thereby rendering polyester based urethane products more durable. Foams and adhesives were made by this process. The problem was that polyester urethanes were subject to destruction by hydrolysis. Moreover, diisocyanates, which were the most expensive ingredient, were required in large quantities and therefore the finished product was too costly for extensive commercial exploitation.

Working to solve this problem culminated in the Windemuth patent, attributed to Dr. Bayer, Erwin Windemuth and Herman Schnell. This patent was issued in Germany in 1951, filed in this country on May 6, 1952,[12] and issued here on August 9, 1960. Its great advance over prior teaching was in the making of polyether (as opposed to polyester) based urethanes. Ethers are sensitive, to hydrolysis but are not destroyed by water, as are esters. Moreover, here the diisocyanate ingredient necessary for cross linkage is not required in such large quantities so that the resultant product is less expensive to produce.

The Windemuth patent disclosed a process pursuant to which polyalkylene ether oxide compounds with at least two hydroxyl groups reacting with an excess of diisocyanates produced urethane products (foams, etc.) of the kind disclosed by Heiss. Windemuth refers to alkylene oxide and plaintiff contends, and all experts at trial concede, that alkylene oxide includes ethylene and propylene oxide. That Windemuth had in mind only ethylene and did not know or recognize the special qualities of propylene oxide is made clear by the fact, however, that throughout the patent disclosure reference is made to the finished product as "dissolving in cold water"; "generally insoluble in water"; "swell [ing] on contact with water"; "distinguished by a remarkable swelling behavior".[13]

12. The date of conception of the Heiss process is given as September 14, 1951 and the date of reduction to practice is given as September 1952 for the process involved here. In addition, defendant has produced notebook references which show that Heiss had the conception disclosed by Windemuth by October 10, 1951 and had reduced the Windemuth teaching to practice (making foams by reacting a condensate of ethylene oxide and glycerine with an excess of diisocyanates) by late October, 1951. The Windemuth patent was filed in this country on May 6, 1952. Under these circumstances it is argued that Windemuth cannot be regarded as prior art to Heiss since Heiss should be accorded priority over Windemuth. See Application of Stempel, 241 F.2d 755 (C.C.P.A.1957); Application of Clarke, 356 F.2d 987 (C.C.P.A.1966). My problem with this argument is that Heiss had all documents presented here to show the Patent Office that Windemuth was not entitled to be cited as a prior reference. Although he did present this proof during the Price-Heiss interference to demonstrate reduction to practice and priority over Price, no such claim was made as to Windemuth. It is cited as prior art in the issuance of the Heiss patent with the evident acquiescence of Heiss, and I see no need at this late date to depart from that determination by the Patent Office.

13. Plaintiff argues that since alkylene oxide includes both ethylene and propylene, the Heiss argument during the prosecution of his application that Windemuth disclosed only ethylene oxide misled the examiner, and, therefore, the patent ought to be invalidated. That argument has no merit. A patent may be invalidated or its validity undermined if the applicant misleads the Patent Office, see, e. g., Monsanto Company v. Rohm And Haas Co., 312 F.Supp. 778 (E.D.Pa.1970), aff'd, 456 F.2d 592 (3rd Cir.),

Instead of an ethylene oxide condensate with two hydroxyl groups, Heiss' invention calls for a propylene oxide condensate with three or four hydroxyl groups. This is essentially the only difference between the two processes, but that difference transferred hegemony in the production of polyurethanes from Germany to this country. The German developed urethanes won acceptance in Europe but the foam products, because of their relative rigidity, sensitivity to water and to crystallization did not meet with much success in this country. Propylene oxide based foams are resistant to water sensitivity and crystallization and can be produced in both rigid and flexible form. Today, in the United States, one-half billion dollars in sales and one billion pounds of polyether derived propylene oxide foams, both rigid and flexible, are produced annually with flexible foam constituting over half the market. These are the foams covered in the Heiss patent by the claims in litigation here.

 The Sokol reference is not prior art. It is true his patent calls for a propylene oxide condensate, but it had nothing to do with the production of urethanes; the Hill patent cannot be considered prior art; although he utilized a propylene oxide condensate, he obtained cross linkage through an entirely different process. Bayer led to Windemuth which has been discussed previously. Thus, as the polyether urethane constituted a great advance over polyester urethane, polypropylene based urethane constituted a still further advance in the art. Windemuth was prior art, but the Heiss process was novel and distinct and an advance beyond Windemuth's teachings. Therefore, the validity of the Heiss patent cannot be successfully challenged as being unpatentable over Windemuth although its teachings do constitute prior art.

*The Issue of Obviousness*:

 Since the only fundamental difference between Windemuth and Heiss was the use of propylene oxide, rather than ethylene, and since Windemuth makes reference to alkylene oxide which includes propylene oxide, plaintiff argues that Windemuth rendered the Heiss invention "obvious". Thus, the question to be determined is whether the difference between the Heiss patent and "the prior art [is] such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art. . . ." 35 U.S.C. § 103. In resolving that question it is necessary to: (1) determine the scope and content of the prior art; (2) to ascertain the differences between the prior art and the claims at issue, and (3) to establish the level of ordinary skill in the technology in question. "Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, *etc.*, might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy." Graham v. John Deere Co. of Kansas City, 383 U.S. 1, 17–18, 86 S.Ct. 684, 694, 15 L. Ed.2d 545 (1966).

As has been indicated above, prior art had advanced from development of polyester based urethanes to polyether based urethanes by the time of the Heiss invention. Polypropylene oxide based urethanes being less subject to water sensitivity and crystallization than ethylene

cert. denied, 407 U.S. 934, 92 S.Ct. 2463, 32 L.Ed.2d 817 (1972). The yardstick, however, is whether the patentee has failed to give the Patent Office some vital information in connection with his application or has provided information in respect thereto which is erroneous or false. Nothing of that sort occurred in this instance. Heiss argued that Windemuth disclosed only ethy-

lene oxide. The examiner had the Windemuth patent before him; he knew, as an expert, that technically alkylene oxide embraced propylene, as well as ethylene oxide, but read the patent as in reality disclosing only ethylene oxide. He was not misled or misinformed; the examiner merely agreed with Heiss' contentions.

oxide based urethanes rendered the former an advance in the art. Yet, since propylene is a hemolog of ethylene, the question to be answered is whether it was not obvious on reading Windemuth to a person of ordinary skill in the art that the development of propylene oxide based urethane would follow as a next logical step. I find that the water resistant properties of polyether propylene oxide based urethanes which give them the great commercial superiority over polyether ethylene oxide based urethanes would not have been obvious to one of ordinary skill in the art at the time of the Heiss application.

Propylene glycols up to a molecular weight of 750 are soluble in water. Thereafter, water solubility decreases. To substitute propylene oxide condensate for an ethylene oxide condensate and thereby conquer the problem of water sensitivity, therefore, was not clear. A person of ordinary skill in the art at the time of the Price, Heiss experiments would, it seems to me, reach the conclusion that there was no distinction in reference to water sensitivity and hyrolysis between using ethylene and propylene.

 I am supported in the conclusion that the unexpected properties of propylene oxide were unobvious at the time to one of ordinary skill in the art, see Application of Courtright, 377 F.2d 647 (C.

C.P.A.1967); Application of Petrzilka, 424 F.2d 1102 (C.C.P.A.1970), by Dr. Charles Price himself.[14] In a speech, "How Chemists Create a New Product", he gave on February 2, 1961, published in the April, 1961 issue of "The Chemist", at pages 131, 133, Dr. Price said:

"While the claims [of the Windemuth patent] cover all poly (alkylene oxides), the disclosure and examples mention only poly (ethylene oxide). These German Chemists [Windemuth, Schnell and Bayer] were working in a laboratory which led the world in developing polyester polyurethanes. In a patent filed over two years after our conception and reduction to practice, they had clearly failed to recognize the significant advantages of the propylene oxide unit over the ethylene oxide unit in decreasing water sensitivity and crystallization."

If the significance of propylene oxide in this respect was not recognized by Bayer, Windemuth and Schnell, who could hardly be classified as men of mere "ordinary skill", it is difficult for me to give credence to a contention that an ordinary journeyman would have understood that propylene oxide had these unexpected qualities in 1950 and 1951.[15]

I am compelled to conclude, therefore, that the Heiss patent meets the test of obviousness under 35 U.S.C. § 103.

14. Jefferson argues that General cannot, in good faith, argue obviousness here as to Heiss, since it projected the Price patent as valid in licensing the industry for the production of polyether propylene oxide based urethane foams under the Price patent. Jefferson asserts General's contention undercuts the validity of the Price patent and that it is taking that position only because its licenses are fully paid up. Thus, the argument goes General's assertions come within the unclean hands doctrine, and it should be barred from taking that position. It seems to me, however, that General has no choice other than to make this argument. Having admitted infringement, if the Heiss patent is valid, General has only two basic defenses—prior conception and prior reduction to practice by Dr. Price and invalidity of the Heiss patent—and is entitled to make both arguments despite their inherent inconsistency.

15. Moreover, Dr. Price and Mr. Heiss testified that in making their respective experiments in 1949 and 1952, they had to make in their own laboratories the propylene oxide which they used. This leads me to believe that propylene oxide did not become readily available commercially until the Price and Heiss disclosures. The testimony in the record is that it became commercially available in the 1950's, but Jefferson made no effort at trial to show specifically when in the 1950's this occurred. Therefore, while I cannot base any conclusion on what is only an unresolved suspicion, it is only fair to say that my conjecture that propylene oxide became commercially available on a wide scale coincident with Price-Heiss disclosures did produce added skepticism that its special properties would have been obvious to one of ordinary skill prior to the Price-Heiss disclosures.

*The Issue of Prior Conception and Prior Reduction to Practice:*

 Since I have found that Windemuth does not invalidate Heiss' claim, the next question is to determine priority as between Heiss and Price. Mr. Heiss filed his·application in the Patent Office on August 7, 1953, while Dr. Price's application was filed on September 23, 1953. The inventor who is first to conceive and reduce his invention to practice is ordinarily awarded priority. Boyce v. Anderson, 451 F.2d 818 (9th Cir. 1971). Conception is the complete mental performance and all that remains necessary is construction. Priority over the application date of another is established when the experiment which predates the application is made sufficiently plain for those skilled in the art to understand it and reproduce it. The notebook in these respects constitutes a contemporaneous record of the inventor's thoughts and actions. See Townsend v. Smith, 36 F.2d 292, 295 (C.C.P.A.1929); Summers v. Vogel, 332 F.2d 810, 814 (C.C.P.A.1964); Kardulas v. Florida Machine Products Co., 438 F.2d 1118 (5th Cir. 1971); Langer v. Kaufman, 465 F.2d 915 (C.C.P.A.1972). However, unless a party can establish to a certainty as absolute as in a criminal case that his date of conception and reduction to practice preceded the date of the patent application, the application date controls. Karr v. Botkins Grain & Feed Co., 329 F.Supp. 411, 413 (S.D. Ohio 1970).

Dr. Price testified here, as in the interference, that he had the conception of making polyether propylene based urethanes in January 1949, and that he secured from General a grant to permit Dr. Herbst, a graduate student under him at Notre Dame, to work on the project and that in April, 1949, Dr. Herbst succeeded in producing the finished product. Produced at trial were reports of Dr. Herbst in memorandum form from him to Dr. Price which in turn were passed on to General. These records are disjointed and incomplete and do not make explicit that the process here in question was successfully concluded. Other than the unsatisfactory memoranda, initially prepared by Dr. Herbst for Dr. Price and transmitted by him to General, there is nothing to show reduction to practice prior to September 23, 1953 by Dr. Price. Dr. Herbst testified that more thorough records were in a notebook he kept which apparently was destroyed by fire.

 While this loss is unfortunate, the burden is on the plaintiff to prove that Dr. Price is entitled to a date earlier than that of his application. That burden has not been met.[16] While it is unnecessary, therefore, for me to determine the date of conception and reduction to practice by Heiss prior to the August 7, 1953 date of his application to accord him priority over Price, there is a sufficient showing in the record on the basis of notebook recordings to establish that Heiss had the conception of polyether propylene oxide based urethane on September 14, 1951; and that he successfully performed an experiment producing a polyether propylene oxide based urethane foam in September, 1952. Thus, I conclude that Heiss' claims are entitled to priority over Price, insofar as General is now contending that the Price and Heiss processes are to the same invention.

 General argues that the Heiss claims were triggered by knowledge of the issuance of the Price patent; that the claims which are in issue here were first made a part of the Heiss application on February 6, 1959. Therefore, the nonstatutory doctrine of late claiming is urged as rendering the patent invalid and/or as entitling the claims to date only from the time when they were added to the application (February 6, 1959), rather than the date the

---

16. In the Price-Heiss interference the attorney for Dr. Price indicated to him that he did not believe he would prevail on the issue of prior reduction to practice on the basis of proof of experiments at Notre Dame. I agree with this conclusion.

application was filed. The rules of the Patent Office provide for "cancelling particular claims" and "presenting new claims" (Patent Office Rule 119). These claims, when allowed, take the original filing date of the application, even where there has been an intervening public use before the amendment has been made. See Coats Loaders & Stackers, Inc. v. Henderson, 233 F.2d 915, 924 (6th Cir. 1956); King-Seeley Thermos Co. v. Refrigerated Dispensers, Inc., 354 F.2d 533, 539 (10th Cir. 1965). Moreover, the law seems settled, in the absence of some countervailing showing not made here, that the effective date of the claims of the continuous applications are those of the original application.[17] General's argument in this regard is, therefore, rejected.

Plaintiff's argument of invalidity because of double patenting fails since I have found that the Heiss patent is novel and distinct, and an advance in the art over Windemuth. In addition, its argument that Heiss is not the inventor is equally without merit. The transfer of the original Saunders-Heiss application to Heiss as sole inventor was made in conformity to the rules of the Patent Office and allowed by it. Plaintiff has presented nothing to undermine that allowance by the Patent Office and its argument is rejected.

Finally, I find no illegality in the agreement between Mobay Chemical Corporation and Jefferson either under federal law, or, assuming New York law applies, under New York law. The agreement, as has been indicated earlier, gives to Jefferson proprietary ownership and title to the Heiss patent. It is true that a condition of the agreement is either the issuance of one license under the Heiss patent or institution of a lawsuit within a two-year time frame. This, however, does not condition Jefferson's right to the patent solely on the grounds that it sue.

The New York statute, N.Y. Judiciary Law § 489 (McKinney's Consol.Laws, c. 30, 1968), provides that " . . . no corporation . . . shall solicit, buy or take an assignment of, . . . a bond . . . or other thing in action, or any claim or demand, with the intent and for the purpose of bringing an action or proceeding thereon. . . ."

Plaintiffs rely primarily on American Optical Co. v. Curtiss, 173 U.S.P.Q. 654 (S.D.N.Y.1971). Judge Ryan made clear the limited reach of his holding when he stated:

"It is true that the Agreement would not have been illegal under New York law if the University owned a patent and had made an absolute assignment of it to A.O., without conditioning the assignment upon the commencement of a suit by A.O. . . . Here, however, the assignment Agreement between the University and A. O. provided for and required A.O. to bring a lawsuit. Indeed, the Agreement appears to have been a contrivance solicited by A.O. to enable it to bring suit on behalf of the University, and the proposed suit was the very purpose and substance of the Agreement. A. O.'s intent to sue was not merely incidental and contingent. . . ." Id. at 657 (Citations and footnote omitted.)

Moreover, in Fairchild Hiller Corporation v. McDonnell Douglas Corporation, 28 N.Y.2d 325, 321 N.Y.S.2d 857, 270 N.E.2d 691 (1971), the New York Court of Appeals said of § 489:

"We have consistently held that in order to fall within the statutory prohibition, the assignment must be made for the very purpose of bringing suit and this implies an exclusion of any other purpose. . . . 'The statute does not embrace a case where some other purpose induced the purchase, and the intent to sue was merely inci-

---

17. A thorough discussion of this issue is Flocks and Neimark, Is There a Viable Doctrine of Non-Statutory Late Claiming as a Defense in Patent Litigation, 500 J.Pat. Off.Soc'y 676 et seq. (1968).

dental and contingent.'" Quoting Sprung v. Jaffe, 3 N.Y.2d 539, 544, 169 N.Y.S.2d 456, 460, 147 N.E.2d 6.

It follows from what has been said that the plaintiff's action is dismissed, and that defendant's counterclaim for an injunction enjoining plaintiff from further infringement of the Heiss patent and for an accounting and damages is granted. Defendant's counterclaim for attorney fees and expenses is denied.

The foregoing constitutes the court's findings of fact and conclusions of law.

Settle order.