ELI LILLY AND COMPANY

v.

PREMO PHARMACEUTICAL LABORATORIES, INC., Federal Pharmacal, Inc., Seymour N. Blackman, Steven Blackman, John Blackman, Appellants,

v.

Richard D. WOOD, C. Harvey Bradley, Jr., Earl B. Herr, Jr., Cornelius W. Pettinga, Eugene L. Step and Arthur R. Whale, Additional defendants on the Counterclaim.

No. 79–1954.

United States Court of Appeals, Third Circuit.

Argued Feb. 14, 1980.

Decided July 11, 1980.

Edward N. Sherry, New York City, for plaintiff–appellee Eli Lilly and Co.; Jack Kaufmann, J. Jay Rakow, Dewey, Ballantine, Bushby, Palmer & Wood, New York City, D. Dennis Allegretti, Allegretti, Newitt, Witcoff & McAndrews, Chicago, Ill., Arthur R. Whale, Walter E. Buting, Indianapolis, Ind., of counsel.

David B. Kirschstein (argued), Kirschstein, Kirschstein, Ottinger & Cobrin, P. C., New York City, for defendants–appellants Premo Pharmaceutical Laboratories, Inc., et al.

Before ADAMS, VAN DUSEN and GARTH, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

On this appeal from an order granting preliminary injunctive relief in a patent case, we are presented inter alia with the provocative question whether, in determining that a new chemical compound was "nonobvious" in view of prior art, all of the properties of the drug may be considered, or whether the structural similarity between the new compound and the prior art constitutes a per se bar to patentability. Appellant also raises several other issues regarding the validity of the patent at issue here, and urges that the district court abused its discretion in granting the preliminary injunction. Inasmuch as we conclude that the "structural similary" of a new compound is not a bar to patentability, that the

district court did not err in applying the applicable law, and that the court did not abuse its discretion in granting injunctive relief, we affirm.

## FACTUAL BACKGROUND

### A. The Parties and Procedural Posture of the Case

Eli Lilly and Company is engaged in the business of research, development, manufacture, and sale of ethical pharmaceutical products. It invests approximately ten percent of its net sales revenue in research and development, in 1978 such expenditures exceeded $140 million. The company has acquired patents on many of its products which, it claims, are "a cornerstone of the research efforts that in turn have led to the development of new products."[1]

Premo Pharmaceutical Laboratories, Inc. is engaged primarily in the manufacture and sale of generic pharmaceutical products that are duplicative of drugs developed and manufactured by research–oriented companies. Because Premo has only a small research and development budget, it is generally able to sell its products at prices lower than those offered by competitors that engage in more extensive research and development.

Eli Lilly owns patents for cephalexin, an oral antibiotic that is commonly used as a substitute for penicillin.[2] Upon learning that Premo had acquired a large quantity of cephalexin from Italy and was planning to sell the drug in the United States, Eli Lilly brought this action for declaratory judgment, preliminary and permanent injunctive relief, and damages. Following several months of discovery, Eli Lilly applied for a preliminary injunction by which it sought to enjoin Premo from selling cephalexin. The primary question presented in the district court was whether the patent is valid.[3]

After conducting an extensive hearing, the trial court entered an order on July 24, 1979 preliminarily enjoining Premo from infringing the patent by "the manufacture, use, sale, offering for sale, or promoting or inducing the sale in the United States, its territories or possessions, of cephalexin."[4] In its opinion, the court held that (1) the creation of cephalexin was not merely an obvious extension of the prior art, because the drug yielded the unexpected property of being almost 100% absorbable into the bloodstream; (2) Eli Lilly adequately disclosed this characteristic in its patent application; (3) Eli Lilly established a sufficiently high probability that it would succeed on the merits of its claim to warrant the issuance of a preliminary injunction; and (4) Eli Lilly would be irreparably harmed if Premo were permitted, even temporarily, to sell cephalexin.[5] Premo filed a timely appeal.[6]

---

1. Brief for Appellee at 4.

2. The patent for cephalexin monohydrate, entitled "certain 3-Methyl Cephalosparin Compounds," is U.S. Patent No. 3,507,861 (hereinafter '861 patent). Eli Lilly also owns the patent for an invention entitled "Crystalline Cephalexin Monohydrate," U.S. Patent No. 3,655,656 (hereinafter '656 patent). The latter, commonly known as "dense form cephalexin," is a type of cephalexin monohydrate that is especially suitable for oral administration. This appeal involves only the '861 patent.
    The validity of both the '656 and '861 patents was the subject of an earlier suit for declaratory relief brought against Eli Lilly by Zenith Laboratories, Inc. The case was settled after the district court granted Eli Lilly's application for a preliminary injunction that enjoined Zenith from selling dense form cephalexin in violation of the '656 patent. Much of part I of today's opinion is drawn from Judge Meanor's extensive and detailed description of the struc-

ture and development of cephalexin and its precursors that is set forth in the opinion in the Zenith case. Zenith Laboratories, Inc. v. Eli Lilly and Co., 460 F.Supp. 812 (D.N.J.1978).

3. Premo conceded that if the '861 patent is valid, Premo's product infringes it. Also, Premo made no claim that cephalexin is not a "new and useful" product within the meaning of 35 U.S.C. § 101 (1976), or that cephalexin lacked "novelty" as defined by 35 U.S.C. § 102 (Supp. II 1978).

4. Preliminary Injunction Order, July 24, 1979, App. 66.

5. Eli Lilly & Co. v. Premo Pharmaceutical Laboratories, Inc., Civ. No. 78–2589, slip op. at 12 26 (D.N.J. filed July 13, 1979). Premo conceded that Eli Lilly owned the patent, and that, if the patent is valid, Premo had infringed it.

6. Appellate jurisdiction is conferred by 28 U.S.C. § 1292(a)(1) (1976).

## B. The Development of Cephalexin

Cephalexin monohydrate is a member of the cephalosporin family of antibiotic drugs. Cephalosporins are derived from the fungus *Cephalosporium acremonium* and contain a nuclear ring structure not otherwise found in nature. The common structural characteristic of the cephalexin family is formed by a six–membered ring of 7–aminocephalosporanic acid (7–ACA). The various cephalosporins differ from one another in the number and type of side chains attached to the seven–position of the nucleus and the type of substituent attached to the three–position of the nucleus.[7] While all cephalosporins have approximately the same range of antibiotic activity and toxicity, the structural variations result in different pharmacological properties. That is, each cephalosporin reacts differently with the human body.

As a group, cephalosporins are uniquely effective antibiotics. Bacteria are commonly classified in two basic groups: those that take the so–called Gram stain are termed Gram–positive; those that reject the stain are termed Gram–negative. Penicillin is active only against Gram–positive bacteria. In contrast, cephalosporins are effective against both Gram–positive and Gram–negative bacterial strains. Cephalosporins also have low toxicity and allergenicity, and therefore produce relatively few adverse side effects and allergic reactions. As a consequence, cephalosporins are frequently used to treat individuals who are allergic to penicillin.

The parent compound of the cephalosporin family, Cephalosporin–C, was first isolated in the 1950's by two British scientists, Professor E. P. Abraham and Dr. G. G. F. Newton.[8] In the early 1960's, scientists discovered a method of isolating the 7–ACA nucleus and of appending various side chains and substituents in order to create a variety of cephalosporins more potent than Cephalosporin–C. The method of isolation was expensive, however, which made commercial production of cephalosporins infeasible at that time. Shortly thereafter, the National Research Development Corporation, a Crown agency of Great Britain founded to assist the commercialization of British inventions, began promoting cephalosporin research. The Corporation entered into agreements with a number of pharmaceutical companies under which the companies promised to participate in cephalosporin research and to make their findings available to the Corporation in exchange for access to the results of prior research and other assistance. Eli Lilly was a party to this accord.

Eli Lilly was the first company to develop a cost–efficient method of producing a 7–ACA nucleus, and by early 1962 its first cephalosporin antibiotic was ready for clinical testing. In 1964, it began marketing a form of cephalosporin, cephalothin, under the trademark "Keflin," and, in 1968, introduced cephaloridine under the brand name "Loridine." These drugs were effective antibiotics only when administered intravenously, however, because they were not sufficiently absorbed into the blood stream from the digestive tract to make oral administration feasible. Consequently, Eli Lilly began experimenting with the side chain attached to the 7–ACA cephalosporin nucleus in order to construct an orally effective form of cephalosporin. It achieved this goal by substituting a phenylglycine side chain at the 7–position. The company's research consultant, Edwin H. Flynn, who was extensively involved in the research, has stated that this result was surprising because identical experimentation with the penicillin nucleus had made that drug active against Gram–negative bacteria–a trait that cephalosporins already possessed.[9] The first orally administerable ce-

7. Diagrams of the cephalosporin nucleus, as well as cephaloglycin and cephalexin are reproduced in the appendix, *infra*.

8. *See* Abraham & Newton, *New Penicillins, cephalosporins C and penicillinase*, Endeavor, April 1961, at 92.

9. Affidavit of Edwin H. Flynn, Nov. 27, 1978, at 8 9, App. 105, 112–13.

phalosporin was called cephaloglycin and was marketed in 1970 by Eli Lilly under the trademark "Kafocin."

Cephaloglycin was found to be eighteen to twenty–two percent absorbed into the bloodstream, which is a sufficient percentage to be a satisfactory oral antibiotic. More than half of the cephaloglycin absorbed, however, underwent a chemical conversion that substantially diminished one of its most useful properties–effectiveness against Gram–negative bacteria.

In the course of the search for an orally administerable cephalosporin that also retained its activity against Gram–negative bacteria, two researchers at Eli Lilly, Dr. Robert E. Morin and Dr. Billy G. Jackson, discovered a novel chemical reaction by which various penicillins could be converted into a type of cephalosporin compound that contains a methyl group at the 3–position in place of the acetoxymethyl group that naturally exists at that position of the cephalosporin nucleus. Although the 3–methyl cephalosporin, unlike cephaloglycin, underwent no chemical changes upon absorption, and therefore remained completely active against Gram–negative bacteria, the scientists found that the drug displayed a markedly lower level of activity than corresponding cephalosporins that contain the natural acetoxymethyl group. As a result, Eli Lilly

directed its research away from 3–methyl cephalosporin.

Following a series of unsuccessful experiments with other forms of cephalosporin, Drs. Morin and Jackson urged their colleagues to test once again 3–methyl cephalosporin. In 1965, the researchers subjected cephaloglycin to hydrogenolysis to form the 3–methyl cephalosporin that later came to be known as cephalexin. Cephalexin retained the 3–methyl cephalosporin characteristics of being completely active against Gram–negative bacteria and exhibiting a reduced level of activity. However, cephalexin yielded the unexpected property of being absorbed virtually one hundred percent into the bloodstream and completely excreted in the urine without chemical alteration. The one hundred percent absorption rate more than offset the reduction in the level of activity.[10] As a result, cephalexin is a highly effective oral antibiotic.[11] Eli Lilly obtained a patent for cehpalexin on April 21, 1970.[12] It is the question of the validity of this patent that is before us today.

## C. Eli Lilly's Production and Marketing of Cephalexin

From 1958 to 1977, Eli Lilly invested approximately $10 million in the research and development of cephalexin. The research included the chemical synthesis experiments described above, "laboratory evaluations *in vitro* and *in vivo*, development of analytical

---

**10.** The so called Morin Jackson process, entitled "Penicillin Conversion Via Sulfoxide," is protected by U.S. Patent No. 3,275,626.

**11.** In its original form, cephalexin, although effective when administered orally, was not well suited for oral consumption. The cephalexin molecule was originally produced at room temperature as a dihydrate. Because the dihydrate crystals were so bulky and fluffy, a full dose could not be put into a single capsule of acceptable size. On drying, the dihydrate crystals are converted into monohydrate crystals. The cephalexin nonohydrate thus formed was also bulky, however, and the crystals tended to pick up a static charge, which made handling and encapsulation impracticable on a commercial basis.

Accordingly, Eli Lilly began searching for an alternative method of producing cephalexin. Dr. Earle Van Heyningen, an Eli Lilly scientist,

discovered a process of crystallizing cephalexin monohydrate at temperatures greater than 60 degrees centigrade such that the crystals obtained were relatively large, nonhygroscopic, dense, and nonelectro statically excitable. These crystals could be encapsulized relatively easily, and were small enough so that a single dose would fit into a capsule of acceptable size. The patent for this dense form cephalexin was issued on April 11, 1972. U.S. Patent No. 3,655,656. *See* note 2 *supra*. Eli Lilly markets most of its cephalexin in this form under the trademark Keflex.

The patent for dense form cephalexin (the '656 patent) is premised on the validity of the patent for regular cephalexin (the '861 patent) which is at issue in this case.

**12.** U.S. Patent No. 3,507,861.

methods, development of processes for the production and purification of cephalexin monohydrate as a chemical product, [and] animal and human pharmacology and metabolism studies." [13] From 1968 to 1977, Eli Lilly spent more than $1.8 million on clinical testing of cephalexin on human beings. A substantial portion of this sum was used to finance studies required by the United States Food and Drug Administration (FDA). More than half of the $1.8 million was spent in post–marketing studies that were designed to adduce additional information about the effectiveness and potential dangers of cephalexin.[14]

Eli Lilly has been quite successful in marketing cephalexin. Cephalexin has become the most widely prescribed oral cephalosporin in the United States, and is the most common substitute for oral penicillin administered to penicillin–allergic patients. Moreover, because of its greater absorption rate, cephalexin generally competes well against ampicillin, penicillin, and other cephalosporins.

*D. The Response of the Pharmaceutical Industry to Eli Lilly's Patent on Cephalexin*

In general the other members of the domestic pharmaceutical industry appear to have been interested in selling cephalexin, but have refrained from challenging Eli Lilly's patents. From 1970, when the first patent on cephalexin was issued, until 1977, Eli Lilly was the sole seller of cephalexin in the United States. During that period, two small domestic drug companies sought to obtain licenses to manufacture cephalexin, but Eli Lilly denied their requests. Four multinational pharmaceutical companies that manufacture cephalexin abroad or have the capacity to produce it here thus far have respected Eli Lilly's patent. None of these companies has a license or other agreement with Eli Lilly that would be

jeopardized by an attempt to enter the United States cephalexin market.[15]

Zenith Laboratories, Inc., a domestic producer of generic drugs, began marketing cephalexin in this country in 1977. It produced very little of the drug itself and obtained most of its supply from an Italian manufacturer. Following the issuance of a preliminary injunction against such sales, however, Zenith voluntarily withdrew from the market.[16]

In August or September 1978, Premo advised Eli Lilly that it had obtained large quantities of cephalexin from foreign manufacturers, had put cephalexin into dosage–sized capsules, and was planning to sell the drug in the United States. Premo also stated that it believed Eli Lilly's patent on cephalexin was invalid and therefore unenforceable. In response to this information, Eli Lilly brought the present action to declare the patent valid and to enjoin Premo, preliminarily and then permanently, from selling cephalexin in the United States.

**II. ISSUES PRESENTED ON APPEAL**

On this appeal, Premo raises a number of related contentions. First, it argues that the district court erred in holding that, although structurally obvious in light of prior art, cephalexin was nevertheless patentable because it yielded the unanticipated and nonobvious characteristic of one hundred percent absorbability into the bloodstream. Second, it urges that, even if the district court did not so err, Eli Lilly's patent is invalid because the company did not adequately disclose the absorbability trait in either the patent or in the patent application. Third, it claims the patent is invalid because Eli Lilly disclosed the trait in an amendment to the original Abstract of Disclosure in violation of the statutory prohibition against introducing new matter by amendment. Fourth, it maintains that the

---

13. *Zenith Laboratories, Inc. v. Eli Lilly & Co.,* 460 F.Supp. 812, 816–17 (D.N.J.1978).

14. In addition, during the first two years of distribution, Eli Lilly expended approximately $12.3 million on a variety of activities designed to encourage physicians to prescribe cephalexin.

15. *Zenith Laboratories, Inc. v. Eli Lilly & Co.,* 460 F.Supp. 812, 818 (D.N.J.1978).

16. The injunction covered only the patent on dense form cephalexin (the '656 patent). *See* notes 2 & 11 *supra.*

patent is invalid because the unexpected property was discovered by someone other than the persons listed in the patent application as the inventors. Fifth, it disputes the district court's conclusion that other domestic drug manufacturers acquiesced in Eli Lilly's patent on cephalexin. Sixth, it contends that the district court abused its discretion in granting the preliminary injunction. We shall address these claims seriatim.

## III. DISCUSSION OF PREMO'S CONTENTIONS

### A. Validity of Patent

Eli Lilly's patent on cephalexin was valid, according to the district court, for two reasons: (1) Eli Lilly had complied with all statutory requirements. (2) The pharmaceutical industry's acquiescence in the patent represents sufficient circumstantial proof that the patent is valid. Inasmuch as

we conclude that the patent is valid because Eli Lilly fulfilled all statutory requirements, we have no occasion to address the latter basis for the district court's decision.

### 1. Structural Obviousness and the Unanticipated Trait

The Patent Act of 1952 [17] sets forth three general requirements for patentability: novelty and utility as defined in § 101 and § 102, and nonobviousness as defined in § 103. The first two sections express the traditional prerequisites of patentability that in this country date back at least to the Patent Act of 1790.[18] There is no dispute in this case regarding novelty or the utility of cephalexin. Rather, Premo's primary claim is focused on the nonobviousness requirement of § 103, which was explicitly added to the patent laws in 1952.[19]

Section 103 provides:

> (f) he did not himself invent the subject matter sought to be patented, or
>
> (g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.

35 U.S.C. §§ 101 & 102 (1976). For a discussion of the historical development of the novelty and utility requirements, see *Graham v. John Deere Co.*, 383 U.S. 1, 5–12, 86 S.Ct. 684, 687–691, 15 L.Ed.2d 545 (1966); *Kitch, Graham v. John Deere Co.: New Standards for Patents*, 1966 Sup.Ct.Rev. 293, 303–30.

---

**17.** 66 Stat. 797, ch. 950 (codified at 35 U.S.C. §§ 100–293 (1976 & Supp. II 1978)).

**18.** Sections 101 and 102 provide respectively:
§ 101. Inventions patentable
Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.
§ 102. Conditions for patentability; novelty and loss of right to patent
A person shall be entitled to a patent unless–
(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or
(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or
(c) he has abandoned the invention, or
(d) the invention was first patented or caused to be patented by the applicant or his legal representatives or assigns in a foreign country prior to the date of the application for patent in this country on an application filed more than twelve months before the filing of the application in the United States, or
(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent, or

**19.** Patent Act of 1952, 66 Stat. 797, ch. 950. In *Hotchkiss v. Greenwood*, 52 U.S. (11 How.) 248, 13 L.Ed. 683 (1851), the Supreme Court formulated a definition of the "new" requirement of § 101 that has been recognized as the forerunner of the nonobviousness requirement. In striking down a patent that involved a mere substitution of materials–porcelain or clay for wood or metal in door knobs–the Court held:

> unless more ingenuity and skill in applying the old method of fastening the shark and the knob were required in the application of it to the clay or porcelain knob than were possessed by an ordinary mechanic acquainted with the business, there was an absence of that degree of skill and ingenuity which constitute essential elements of every invention.

Conditions for patentability; non–obvious subject matter

A patent may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.[20]

Although the ultimate question of validity is one of law,[21] the Supreme Court has stated that the determination of obviousness entails several factual inquiries. In *Graham v. John Deere Co.*,[22] the Court held that under § 103

the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved.[23]

In addition, the Court observed that

[s]uch secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy.[24]

In cases dealing with the patentability of chemical compounds, the question of obviousness is particularly difficult because the differences between the molecular structure of the new drug and the prior art frequently are slight. Hence, the structure of the new compound may well be obvious when compared with the structure of related drugs that were in existence at the time the new drug was synthesized. Under these circumstances, if the patent law were to define a drug solely by its chemical structure, few new drugs would be patentable. As a consequence, the weight of authority—including every court of appeals that has addressed this question—holds that the structural obviousness of a new chemical compound does not, by itself, render the compound non–patentable. Instead, most courts have taken the view that the determination whether a new drug is nonobvious should be based on a consideration of the properties exhibited by the drug as well as the chemical structure of the drug.

The Court of Customs and Patent Appeals was the first appellate court explicitly to adopt this approach. That court's leading opinion on structural obviousness and § 103 is In re Papesch,[25] dealt with the validity of a patent on several trialkyl compounds. The hearing examiner had rejected the patent application on the ground that the new compounds were "obvious homologues of the methyl groups shown in the reference compound and the method of preparation [was] substantially the same."[26] The court held that although the

Following the enactment in 1952 of § 103, there was an extensive academic debate on the question whether Congress intended to make the patentability standard less stringent than the *Hotchkiss* test. *Compare, e. g.*, Note, *The Standard of Patentability–Judicial Interpretation of Section 103 of the Patent Act*, 63 Colum. L.Rev. 306, 310–12 (1963), *with e. g.*, Note, *Patent Law–Test of Invention*, 1956 Wisc.L. Rev. 513, 514–17. The Supreme Court put an end to this debate in *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), in which it held that Congress intended § 103 to codify the "judicial precedents embracing the *Hotchkiss* condition, with . . . directions that inquiries into the obviousness of the subject matter sought to be patented are a prerequisite to patentability." *Id.* at 17, 86 S.Ct. at 693.

20. 35 U.S.C. § 103 (1976).

21. *Great Atlantic and Pacific Tea Co. v. Supermarket Corp.*, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950).

22. 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

23. *Id.* at 17, 86 S.Ct. at 694.

24. *Id.* at 17–18, 86 S.Ct. at 694.

25. 315 F.2d 381 (C.C.P.A.1963).

26. *Id.* at 382. "A homologue is a member of a series of compounds in which each member differs from the next member by a constant number of atoms." *Commissioner of Patents*

new compounds were closely related chemically to the prior art, and therefore were structurally obvious, the drugs nevertheless were patentable. After reviewing a number of its own decisions,[27] in which "patentability was found . . . in spite of close similarity of chemical structure," the court declared:

> From the standpoint of patent law, a compound and all of its properties are inseparable; they are one and the same thing. The graphic formulae, the chemical nomenclature, the systems of classification and study such as the concepts of homology, isomerism, etc., are mere symbols by which compounds can be identified, classified, and compared. But a formula is not a compound and while it may serve in a claim to *identify* what is being patented, as the metes and bounds of a deed identify a plot of land, the *thing* that is patented is not the formula but the compound identified by it.[28]

The court concluded that "[t]here is no basis in law for ignoring any property in making such a comparison."[29] Patentability therefore depends on the outcome of a comparison of both the chemical and pharmacological properties of the old and new compounds.

In subsequent cases, the Court of Customs and Patent Appeals has reaffirmed and, perhaps broadened the *Papesch* principle. In *In re Stemniski*,[30] it overruled the so–called *Hess–Henze* doctrine. The Hess and Henze cases, decided before the passage of the Patent Act of 1952, held that the existence of a homologue was evidence that the new compound was obvious in light of prior art,[31] and that a presumption of obviousness arose where a homologue was disclosed in the prior art.[32] To rebut the presumption, an applicant must have demonstrated that "the claimed compound possesse[d] nonobvious or unexpected beneficial properties not actually possessed by the prior art homologue."[33] In *Stemniski*, the structures of the tin compounds at issue were very similar to the structures known to exist in the prior art. Under the principle set forth in *Hess* and *Henze*, the court observed, the petitioner had the burden of rebutting the presumption of obviousness. But "*Henze*, its predecessors and its progeny," the court asserted, "have met with their share of criticism over the years, both in this court, in other courts and elsewhere."[34] The court, believing that "progress in the useful arts is ill–served by denying patents to inventors in the circumstances at bar," rejected the *Hess–Henze* rule.[35] In its stead, it held that structural similarity, or the existence in the prior art of a homologue, merely establishes a prima facie case of obviousness.[36]

In other decisions, the Court of Customs and Patent Appeals has suggested that the existence of but one unexpected property is enough to establish nonobviousness. For example, in *In re Ackermann*,[37] the prior art disclosed homologues of the claimed compound and provided the suggestion for modifying the homologues to obtain the compound at issue. Following synthesis, however, the new compound was found to be superior as an optical brightener in com-

*v. Deutsche Gold–Und–Silber–Scheideanstalt Vormals Roessler*, 397 F.2d 656, 661 n.13 (D.C. Cir. 1968). *See* R. Morrison & R. Boyd, Organic Chemistry 101 (2d ed. 1966).

27. *E.g., In re Petering and Fall*, 301 F.2d 676 (C.C.P.A.1962); *In re Lamboody*, 300 F.2d 950 (C.C.P.A.1962); *In re Bergel*, 292 F.2d 955 (C.C.P.A.1961); *In re Larsen*, 292 F.2d 531 (C.C.P.A. 1961), *cert. denied*, 370 U.S. 936, 82 S.Ct. 1580, 8 L.Ed.2d 806 (1962).

28. 315 F.2d at 391 (emphasis in original).

29. *Id.*

30. 444 F.2d 581 (C.C.P.A.1971).

31. *In re Hess*, 141 F.2d 122, 125 (C.C.P.A.1944).

32. *In re Henze*, 181 F.2d 196, 201 (C.C.P.A. 1950).

33. *Id.* (emphasis added).

34. 444 F.2d at 587 (footnote omitted).

35. *Id.* (emphasis added).

36. *Id.* at 585.

37. 444 F.2d 1172 (C.C.P.A.1971).

parison with the prior art homologues. Inasmuch as the evidence demonstrated that this trait was unexpected, the court concluded, the new compound was nonobvious:

> The mere fact that such evidence deals with only one of a spectrum of properties possessed by that subject matter does not detract from its relevance. As we alluded to earlier, such evidence tends to prove that the subject matter claimed possesses a difference in properties over that with which it was compared which would have been unexpected. As such it is relevant and, we feel, convincing of unobviousness.[38]

One commentator has suggested that after *Ackermann* and its successors "it is evident that the court of patent appeals often regards the demonstration of significant unexpected properties as almost conclusive proof of nonobviousness."[39]

The other two courts of appeals that have considered the question of structural obviousness and § 103 have adopted the *Papesch* doctrine. In *Commissioner v. Deutsche Gold–Und–Silber–Scheideanstalt Vormals Roessler*,[40] the issue was whether an ammonia–derivative compound which was selected from a group of compounds described by a general formula was patentable. The applicant had introduced evidence that the new compound possessed novel vermicidal properties that were not disclosed or suggested in the prior art and demonstrated that the new compound was more effective than the prior art as an intermediate in the production of patented sedatives and antihistamines. The Court of Appeals for the District of Columbia Circuit, speaking through Judge (now Chief Justice) Burger, articulated four reasons for adopting *Papesch*. First, it construed the Supreme Court's admonition in *Graham*, that a determination of obviousness should depend on "several basic factual inquiries," as directing the courts to look to the relative properties of the new compound and the prior art, as well as to their comparative structures.[41] Second, there exist few compounds whose molecular structure is unknowable prior to their synthesis. The court reasoned that, were it to reject *Papesch*, "few pharmaceutical compounds . . . [would] be patent[able], and the incentive aspect of the patent system, which is basic, . . . be lost from an important area."[42] Third, the court observed that the Patent Office traditionally permitted applicants to prove nonobviousness with evidence that the product possessed novel properties. Fourth, the court recognized that another patentability provision, § 101, focuses on "what the compound will do, and its properties are of prime consideration" for this purpose.[43] Accordingly, it held that the district court correctly considered all properties of the claimed compound in assessing its obviousness.

In another case involving Eli Lilly, the Court of Appeals for the Fifth Circuit also adopted the *Papesch* rule. In *Eli Lilly and Co. v. Generix Drug Sales, Inc.*,[44] Eli Lilly sought preliminarily to enjoin Generix from infringing the patent it owned on a synthetic morphine analgesic compound. The court rejected what it termed a "stultifying per se rule of chemical similarity," and held that Eli Lilly was permitted to introduce evidence that the patented compound exhibited unexpected, nonobvious differences from the prior art. A rule banning the patentability of structurally obvious chemical compounds, in the court's view, would be inconsistent with the purpose of the patent laws if applied to the modern drug industry:

---

**38.** *Id.* at 1176. *In re Merchant*, 575 F.2d 865 (C.C.P.A.1978); *Accord, In re Albrecht*, 514 F.2d 1389 (C.C.P.A.1975); *In re Langer*, 465 F.2d 896 (C.C.P.A.1972); *In re Murch*, 464 F.2d 1051 (C.C.P.A.1972).

**39.** Note, *Standards of Obviousness and the Patentability of Chemical Compounds*, 87 Harv.L. Rev. 607, 612 (1974).

**40.** 397 F.2d 656 (D.C.Cir. 1968).

**41.** *Id.* at 662 (quoting *Graham*, 383 U.S. at 17, 86 S.Ct. at 693).

**42.** 397 F.2d at 663.

**43.** *Id.*

**44.** 460 F.2d 1096 (5th Cir. 1972).

In the field of drug patents today therapeutic value, not chemical composition, is the substance of all incentive to invent. Except where the state of the medical art and the state of the chemical art have been advanced and coordinated to the point that it is possible for the mind to conceive or predict with some minimal reliability a correlation between chemical analogues, homologues or isomers and their therapeutic value, reason compels us to agree that novelty, usefulness and non–obviousness inhere in the true discovery that a chemical compound exhibits a new needed medicinal capability, even though it be closely related to structure to a known or patented drug. When such a fresh, efficacious, undisclosed use is identified, its inventor deserves the full ambit of statutory protection.[45]

Anything short of full patent protection for structurally obvious, but biologically nonobvious, new drugs that meet the other statutory criteria, according to the court, "would discourage both the inspiration–perspiration process of the laboratory and the incentive to publicly disclose products of value to mankind."[46]

■ We too are persuaded that, in determining whether a new drug meets the nonobviousness requirement of § 103, the district courts should consider all of the properties of the drug–including its structure, uses, and other traits–and compare those properties with their counterparts in the prior art. If the new compound, although structurally obvious, exhibits uses or traits that, at the time of their discovery, were not predictable to chemists or other persons skilled in the prior art, such differences indicate that the new compound is nonobvious for purposes of § 103. Whether the existence of an unexpected use or trait should conclusively establish nonobviousness, we need not decide at this time. If the unexpected property results in a substantial improvement over the prior art in respect to the therapeutic effectiveness or usefulness of the drug, however, it would appear to contravene the purposes of the patent laws to deny patentability on the basis of obviousness.[47]

■ The primary difficulty in ascertaining whether a new chemical compound is obvious is that most new compounds created today are the result of modification of an existing compound. Frequently, the alteration is obtained through the use of a known method of synthesis. Hence, in synthesizing cephalexin, the Eli Lilly scientists modified cephaloglycin by substituting a methyl group for the side chain that attached to the cephaloglycin molecule at the

---

45. *Id.* at 1103.

46. *Id.* The Court of Appeals for the Second Circuit has twice been presented with the question regarding structural obviousness and § 103, but has elected both times to dispose of the cases on alternative grounds. *See General Tire & Rubber Co. v. Jefferson Chemical Co., Inc.,* 497 F.2d 1283 (2d Cir.), *cert. denied,* 419 U.S. 968, 95 S.Ct. 232, 42 L.Ed.2d 184 (1974); *Carter–Wallace, Inc. v. Otte,* 474 F.2d 529 (2d Cir. 1972), *cert. denied,* 412 U.S. 929, 93 S.Ct. 2753, 37 L.Ed.2d 156 (1973). In a recent extensive opinion, Judge Weinfeld appeared to adopt the *Papesch* rule. *Warner–Jenkinson Co. v. Allied Chemical Corp.,* 477 F.Supp. 371, 393 (S.D.N.Y.1979) (upholding patentability because "the essential unpredictability of the most important properties negates the claim of obviousness"). Two other district courts have specifically rejected *Papesch. Carter–Wallace, Inc. v. Davis–Edwards Pharmacal Corp.,* 341 F.Supp. 1303, 1333–35 (E.D.N.Y.) (dicta), aff'd on other grounds sub nom., *Carter–Wallace, Inc. v. Otte,* 474 F.2d 529 (2d Cir. 1972), *cert.*

denied, 412 U.S. 929, 93 S.Ct. 2753, 37 L.Ed.2d 156 (1973); *Monsanto Co. v. Rohm & Haas Co.,* 312 F.Supp. 778 (E.D.Pa.1970) (dicta) *aff'd on other grounds,* 456 F.2d 592 (3rd Cir.), *cert. denied,* 407 U.S. 934 (1972). Judge Dooling's opinion in *Carter–Wallace* has met with considerable criticism. One group of commentators has even suggested that should the *Carter–Wallace* dictum become law, "it would literally sound the death–knell to patents on chemical compounds." 1 D. Dunner, J. Gambrell & I. Kayton, Patent Law Perspectives § A.1(1), at text accompanying note 190 (1980).

47. *Cf. Carter–Wallace, Inc. v. Davis–Edwards Pharmacal Corp.,* 341 F.Supp. 1303, 1333–35 (E.D.N.Y.) (denying patentability in part because the pharmacological properties of the claimed compounds were not significant enhancements of the prior art), *aff'd on other grounds sub nom.,* 474 F.2d 529 (2d Cir. 1972), *cert. denied,* 412 U.S. 929, 93 S.Ct. 2753, 37 L.Ed.2d 156 (1973).

3–position of the nuclear ring. There is no claim that this type of modification was not obvious to other chemists working in the field at that time, or that the procedure was a difficult one. Thus, the structural composition of the cephalexin molecule might well be termed obvious in light of the prior art.

That a new compound such as cephalexin may be the end product of a fairly simple series of chemical reactions and structurally similar to a well–known prior–art compound such as cephaloglycin, however, does not necessarily imply that the synthesis of cephalexin itself was obvious. At the time cephalexin was first produced, chemists at Eli Lilly and other pharmacological companies were searching for a cephalosporin that would retain its potency when administered orally. The eighteen to twenty–two percent absorption rate of cephaloglycin permitted it to be administered orally, but its loss of ninety percent of its activity upon absorption prevented it from becoming a commercially effective oral antibiotic. Thus, industry chemists sought to synthesize a cephalosporin compound that would not lose so much of its activity upon absorption.

Eli Lilly chemists testified that they initially focused their attention on the substitution of the 3–methyl group for the side chain, but subsequently rejected this approach because the resulting compound displayed a markedly lower level of activity than cephaloglycin. As a result of the persistence of two chemists, Drs. Morin and Jackson, however, the Eli Lilly research group decided to renew experimentation using the 3–methyl group. The resulting compound—cephalexin—did not, as hoped for, retain a significantly high level of activity. Cephalexin did exhibit, however, the totally unexpected trait of one hundred percent absorption which made it the orally effective cephalosporin for which the chemists had been searching. This unexpected property therefore represented a substantial advancement over the prior art.

Under the circumstances, cephalexin may not reasonably be considered merely an obvious alteration of a previously known substance. At the time cephalexin was originally synthesized, the process of substituting a methyl group for the side chain occurring at the 3–position of a cephaloglycin nucleus was known and easily performable. It was not known, or expected by anyone other than Drs. Morin and Jackson, however, that this substitution would yield a compound that possessed the ultimate characteristic for which industry chemists were searching—that is, effectiveness as an oral antibiotic. Additionally, Drs. Morin and Jackson, who hoped that cephalexin would be such an antibiotic, expected that the salutary effects would occur as a result of the sustained activity of the new drug upon ingestion into the bloodstream. Even they did not consider, let alone anticipate, that cephalexin would be effective because of its one hundred percent absorption rate. Hence, the trait that made cephalexin the highly salutary drug that it is was neither expected by those skilled in the prior art nor anticipated by the chemists who synthesized it.

Section 103 authorizes the denial of patentability only if the "subject matter as a whole" was obvious in light of prior art, and provides that "[p]atentability shall not be negatived by the manner in which the invention was made."[48] The manner of producing cephalexin was readily predictable and performable, and therefore concededly obvious. But the real advancement over the prior art—cephalexin's one hundred percent absorption rate—was totally unexpected, even by the chemists who proposed its synthesis. Hence, taking cephalexin as a whole, we conclude that it was a nonobvious advancement over the prior art. The lack of expectation or anticipation of the one hundred percent level of absorption, in our view, strongly indicates that the idea of creating the new compound required a creative insight.[49]

48. 35 U.S.C. § 103 (1976).

49. See generally Note, supra note 39, at 623–28.

**132**

■ This analysis is strengthened where, as here, the evidence demonstrates that previous attempts to synthesize a cephalosporin compound that performed satisfactorily as an oral antibiotic had exhibited a high degree of unpredictability. Chemists at Eli Lilly and other pharmaceutical companies had worked for years at refining the various cephalosporin compounds in order to obtain an effective oral antibiotic, but were stymied by the last step—finding a compound that would retain a sufficiently high combination of absorbability and activity upon absorption so that it could be produced in orally administerable doses. Against this background, the probability that the Eli Lilly breakthrough was unexpected or nonobvious in relation to the prior art is substantially enhanced.[50] Accordingly, we join our sister courts of appeals in holding that, in cases involving the patentability of chemical compounds, the determination of obviousness under § 103 should be based on a comparison of the structures of all properties possessed by the new compound and the prior art, including their respective structures, uses, and pharmacological traits. For this reason, we conclude that the district court did not err in considering cephalexin's one hundred percent absorption rate during the course of its determination that cephalexin was nonobvious in light of the prior art.

*2. Disclosure of the Nonobvious Trait*

Premo's second contention on appeal is that the patent on cephalexin is invalid because Eli Lilly failed in its application or accompanying forms to disclose precisely the nonobvious trait.

Sections 111 and 112 of the code provide that all patent applications must be accompanied by

A written description of the invention, and of the manner and process of making

and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention. The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.[51]

The Court of Appeals for the Second Circuit, in *Norton Co. v. Bendix Corp.*,[52] reviewed the reasons underlying the disclosure requirement. It stated that § 112 has two primary purposes: (1) to require the patentee to make "a sufficient disclosure to enable one skilled in the art to reconstruct the invention"; and (2) to compel the patentee to "describe his invention with sufficient definiteness to enable others to discern the boundaries beyond which experimentation and invention are undertaken at the risk of infringement."[53] In *Carter–Wallace, Inc. v. Otte*,[54] the court went on to declare that, in cases involving the patentability of structurally obvious chemical compounds, the disclosure standards should be particularly high because otherwise "the public will not obtain the benefit of the particular use which justified the grant of the patent."[55] In *Carter–Wallace*, the owner of the patent on the drug, meprobamate, sought to rely on its unexpected effectiveness as a tranquilizer to support its patentability. The court denied patentability under § 112 because "nothing in the specifications of the CIP application would have led the typical skilled worker in the art to use meprobamate as a tranquilizer."[56]

If the nature of the nonobvious trait "would inherently flow from the indicated

**50.** *See In re May*, 574 F.2d 1082, 1094 (C.C.P.A. 1978).

**51.** 35 U.S.C. §§ 111 & 112 (1976).

**52.** 449 F.2d 553 (2d Cir. 1971).

**53.** *Id.* at 555.

**54.** 474 F.2d 529 (2d Cir. 1972), *cert. denied*, 412 U.S. 929, 93 S.Ct. 2753, 37 L.Ed.2d 156 (1973).

**55.** *Id.* at 542.

**56.** *Id.*

use of the compounds," however, the Court of Customs and Patent Appeals has established that the requirements of § 112 are satisfied. Thus, in *In re Zenitz*,[57] the patent owner sought to overcome a finding of structural obviousness by claiming that the new drugs exhibited a surprising separation of hypotensive and tranquilizing properties. The specification stated that the claimed compounds were useful as hypotensive agents, tranquilizers, antinauseants, anti–pyretics, and sedatives, but made no mention of the nonobvious separation of hypotensive and tranquilizing properties. For this reason, the Patent Office refused to consider the unexpected property, but the Court of Customs and Patent Appeals reversed. The court reasoned that the applicant had "disclosed a tranquilizer and subsequently established that if it is used as a tranquilizer it is a better one for it minimizes the side effects of hypotensive activity."[58] Therefore, the court held that the compounds were patentable because "the advantage of minimized hypotensive activity would inherently flow from the indicated use of the compounds as tranquilizers."[59]

■ Similarly, in an abstract to the patent on cephalexin, which was added by amendment to the application prior to the issuance of the patent, Eli Lilly specified that cephalexin is "especially of interest for its use as an antibiotic when administered by the oral route." While the application was being processed, Eli Lilly also submitted a number of affidavits that specifically listed the oral $ED_{50}$ values, as well as the M.I.C. values for cephalexin. The $ED_{50}$ values, by which chemists measure oral effectiveness, showed that cephalexin is highly effective when administered orally. The M.I.C. values, by which chemists measure antibiotic potency, showed that cephalexin has a low activity level. Taken together, these data should have apprised chemists skilled in the art that cephalexin necessarily

possessed an extremely high absorption rate. The data are part of the file history of the patent on cephalexin. Hence, although the application did not expressly identify the nonobvious trait–the one hundred percent rate of absorption––the information Eli Lilly did supply was such that the nature of the trait could readily be identified by a person skilled in the prior art. Under these circumstances, the nonobvious trait may be said "to flow inherently" from the properties and data supplied in the application and accompanying documents. Therefore, we conclude that Eli Lilly adequately complied with the disclosure requirements of § 112.

### 3. Introduction of New Matter by Amending the Patent Abstract

Section 132 of the code provides inter alia that "[n]o amendment shall introduce the disclosure of the invention."[60] Premo maintains that Eli Lilly violated this provision by amending the patent abstract in 1968 to include the information discussed in part 2 above. The original application filed in 1962 disclosed only that cephalexin could be used as a topical sterilant.

In *Triax Co. v. Hartman Metal Fabricators, Inc.*,[61] the Court of Appeals for the Second Circuit provided the following definition of "new matter" as that term is used in § 132:

An amendment to an application is not "new matter" within the Patent Act or Rules of the Patent Office unless it discloses "an invention, process or apparatus not theretofore described." . . . If the latter–submitted material accused of being "new matter" simply clarifies or completes the prior disclosure it cannot be treated as "new matter." . . . Moreover, the determination of the Patent office to admit the later–submitted material, thereby signifying that the Pat-

**57.** 333 F.2d 924 (C.C.P.A. 1964).

**58.** *Id.* at 928.

**59.** *Id.* at 927. *Accord, In re Khelghatian*, 364 F.2d 870, 876 (C.C.P.A. 1966).

**60.** 35 U.S.C. § 132 (1976).

**61.** 479 F.2d 951 (2d Cir.), *cert. denied,* 414 U.S. 1113, 94 S.Ct. 843, 38 L.Ed.2d 740 (1973).

ent Office does not consider it to be "new matter," is presumptively correct.[62]

■ The 1968 amendment did not disclose an invention, process, or apparatus that was not described in the 1962 application. Rather, the 1968 amendment "completed" the prior disclosure by identifying and "clarifying" some of the properties of cephalexin, as well as its salutary performance as an oral antibiotic. Inasmuch as a chemical compound and its properties "are one and the same thing," [63] newly discovered poperties of the compound not disclosed in the original specification or abstract may be added by amendment without being treated as "new matter" under § 132.[64] Moreover, as in *Triax*, the decision of the Patent Office to admit the material contained in the amendment, which indicates that it did not consider the amendment to be "new matter," should be accorded substantial weight. Under these circumstances, we are not persuaded that the information contained in the 1968 amendment constituted "new matter" in violation of § 132.[65]

### 4. Identification of All Inventors

Section 116 of the code provides that, "[w]hen an invention is made by two or more persons jointly, they shall apply for [a] patent jointly and each sign the application and make the required oath." [66] In *Amax Fly Ash Corp. v. United States*,[67] the Court of Claims held that if greater or fewer than the true number of inventors are named in the application, the patent is void.[68] "However, misjoinder or nonjoinder of inventors are technical defenses requiring clear and convincing evidence." [69]

Premo insists that Eli Lilly failed to comply with this requirement because the patent application listed only Drs. Morin and Jackson, while the one hundred percent absorption rate actually was discovered by the biochemist who tested cephalexin on human subjects in 1967. In support of this contention, Premo relies on *General Tire & Rubber Co. v. Jefferson Chemical Co.*[70] Jefferson was the assignee of a patent on certain types of polyurethanes, and General owned a virtually identical patent. The polyure-

62. *Id.* at 956 57 (citations omitted).

63. *In re Papesch*, 315 F.2d at 391.

64. *Cf: In re Davies*, 475 F.2d 667, 672 (C.C.P.A. 1973) (affirming Patent Office's refusal to consider previously undisclosed unexpected properties, but authorizing refiling of application to incorporate such properties):

> Since the subject matter to be claimed in a subsequently filed application would be identical to that claimed here, the later application would be entitled to the benefit of the filing date of the application we now consider. See *In re Kirchner*, 49 CCPA 1234, 305 F.2d 897, 134 USPQ 324 (1962). We certainly do not think the newly disclosed properties alter the subject matter sought to be patented.

This procedure did not prejudice the applicant in *Davies* because a patent had not yet been granted. In contrast, were we to follow the *Davies* procedure here, Eli Lilly would suffer economic loss. *Davies* would appear to require that the patent be invalidated and Eli Lilly given leave to refile a more complete application until the new application was granted. Premo and other drug companies presumably would be free to sell cephalexin in the United States, because there would exist no valid patent prohibiting such sales.

65. Premo contends that disclosure of the usefulness of cephalexin as an oral antibiotic for the first time in the abstract violated 37 C.F.R. § 1.72(b) (1979), which states in relevant part:

> The purpose of the abstract is to enable the Patent and Trademark Office and the public generally to determine quickly from a cursory inspection the nature and gist of the technical disclosure. The abstract shall not be used for interpreting the scope of the claims.

We disagree. The disclosure in the abstract did not broaden the claim or interpret the scope of the claim, which was and always has been for cephalexin. Instead, the abstract merely showed "the nature and gist of the technical disclosure" by disclosing that cephalexin was useful as an oral antibiotic.

66. 35 U.S.C. § 116 (1976).

67. 514 F.2d 1041 (Ct.Cl.1975) (per curiam).

68. *Id.* at 1050 (citing *Iowa State Univ. Research Foundation, Inc. v. Sperry Rand Corp.*, 444 F.2d 406, 408 (4th Cir. 1971)).

69. *Id.* (citing *Garrett Corp. v. United States*, 422 F.2d 874, 880 (Ct.Cl.1970) (per curiam)).

70. 497 F.2d 1283 (2d Cir.), *cert. denied*, 419 U.S. 968, 95 S.Ct. 232, 42 L.Ed.2d 184 (1974).

thanes at issue were first synthesized by the assignor of the Jefferson patent. The polyurethane compounds were structurally obvious, however, in view of the prior art. Consequently, in support of patentability, Jefferson sought to rely on several unexpected traits exhibited by the polyurethanes. The problem with this theory, according to the Court of Appeals for the Second Circuit, was that the unexpected traits were discovered not by Jefferson or its assignor, but by the assignor of the General patent. The court held that only General's patent was valid because its assignor was the true inventor. Judge Friendly, writing for the court, reasoned that "just as 'accidental results, not intended and not appreciated, do not constitute anticipation,' . . . so an unappreciated result of a structurally obvious modification cannot of itself constitute invention." [71]

After considering Premo's argument on this point the district court dismissed the defense as "specious." [72] Although we believe that *General Tire* is colorable authority for the defense proffered by Premo, we are persuaded that it is distinguishable from the present action.

█ The compound whose patentability is at issue indisputably was synthesized by Drs. Morin and Jackson. They performed the synthesis with the hope that the resulting compound would be the effective oral antibiotic that cephaloglycin and other existing cephalosporins were not. Subsequent testing conducted by an Eli Lilly biochemist on human patients demonstrated that cephalexin was such a drug, although not for the reasons predicted by Drs. Morin and Jackson. Although we have held today that, in assessing the obviousness of a new drug under § 103, courts must consider all of the properties of the new compound, the fact that a person other than Dr. Morin or Dr. Jackson *discovered* the nonobvious trait possessed by cephalexin does not make that person an *inventor* of cephalexin for purposes of § 116. For it is without question

that the named inventors, Drs. Morin and Jackson, were the only persons who performed the synthesis that created the patented product. In the words of § 116, cephalexin was "made by" the two named inventors, not by the biochemist who first noted that the organic chemists' predictions had been realized.

The concerns underlying the Second Circuit's decision in *General Tire* simply are not present here. In *General Tire*, the parties were two companies which each owned a patent for the same compound. The court invalidated Jefferson's patent, which was premised on an unexpected trait, because the original owner of the patent had been unaware of the existence of that trait. Instead, the unexpected trait was first discovered by the assignor of General Tire's patent. Faced with competing claims by companies that each had contributed to the advancement over the prior art—one by synthesizing the new compound, the other by discovering its unexpected trait—the court determined that the owner of the patent whose assignor most contributed to the advancement should have its claim of ownership sustained.

There are no analogous competing claims in this case. Both the synthesis of cephalexin and the discovery of its unexpected trait were conducted by chemists employed by Eli Lilly. In contrast, Premo contributed not at all to either the synthesis or the subsequent testing of cephalexin. As such, there is not present here the equitable consideration which gave rise to the court's decision in *General Tire*—that is, to assign patent ownership to the party that contributed more to the advancement in the state of the art. By identifying Drs. Morin and Jackson as the "makers" of cephalexin, Eli Lilly complied fully with the requirements of § 116. Therefore, we hold that the district court did not err in rejecting Premo's defense in this respect.

---

71. *Id.* at 1291 (citation and footnote omitted).

72. *Eli Lilly & Co. v. Premo Pharmaceutical Laboratories, Inc.*, Civ. No. 78–2589, slip op. at 27 n.14 (D.N.J. filed July 13, 1979).

### 5. Summary

The foregoing are the only contentions advanced by Premo in its challenge to the decision of the district court that Eli Lilly fulfilled all of the statutory requirements of patentability. We have concluded that the district court did not err in any of its conclusions in this regard. Hence, there is no occasion to address Premo's challenge to the district court's finding of industry acquiescence [73] on which the court relied as an alternative basis for its holding that the patent is valid. Accordingly, we turn to Premo's final contention: that the district court abused its discretion in granting Eli Lilly's application for a preliminary injunction.

### B. Preliminary Injunction

■ The standard in this Circuit for a preliminary injunction is well–settled. As we stated in *Constructors Association of Western Pennsylvania v. Kreps*:

> [T]his Court has consistently identified four factors which must be examined in ascertaining the propriety of a preliminary injunction: . . . the moving party must generally show (1) a reasonable probability of eventual success in the litigation and (2) that the movant will be irreparably injured *pendente lite* if relief is not granted. . . . Moreover, while the burden rests upon the moving party to make these two requisite showings, the district court "should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest."
> . . . While these factors structure the inquiry, however, no one aspect will necessarily determine its outcome. Rather, proper judgment entails a "delicate balancing" of all elements. On the basis of the data before it, the district court must attempt to minimize the probable harm to legally protected interests between the time that the motion for a preliminary injunction is filed and the time of the final hearing.[74]

In reviewing the grant or denial of a preliminary injunction, we must affirm the order of the district court unless the court abused its discretion, committed an error of law, or seriously misjudged the evidence.[75]

Premo concedes that, if the patent on cephalexin is valid, the owner of the patent is Eli Lilly and Premo would infringe the patent were it to sell cephalexin in the United States market. Inasmuch as we have concluded that the district court did not err in holding that the patent is valid, it is virtually certain that Eli Lilly will succeed on the merits of its claims for declaratory and permanent injunctive relief. Thus, the first factor, probability of eventual success in the litigation, weighs heavily in favor of the decision to grant the preliminary injunction.

---

**73.** Acquiescence in the owner's patent rights in a commercially successful product by other members of the industry is generally recognized as circumstantial evidence that the patent is valid. Evidence that other firms paid royalties to the patent owner is a particularly strong indicium of validity. *See, e. g., Illinois Tool Works, Inc. v. Sweetheart Plastics, Inc.,* 436 F.2d 1180, 1187 (7th Cir.), *cert. dismissed,* 403 U.S. 942, 91 S.Ct. 2270, 29 L.Ed.2d 722 (1971); *cf: Carter Wallace, Inc. v. Davis–Edwards Pharmacal Corp.,* 443 F.2d 867, 870 75 (2d Cir. 1971), *cert. denied,* 412 U.S. 929, 93 S.Ct. 2753, 37 L.Ed.2d 156 (1973) (industry acquiescence is a prerequisite to the issuance of a preliminary injunction).

The effect of acquiescence is to lessen the patentholder's burden of proof of validity, by creating a presumption of validity, for the purpose of obtaining a preliminary injunction. *See* 8 A. Deller, Walker on Patents § 688 (2d Ed. 1973). Inasmuch as we have sustained the district court's determination of patent validity based on direct technical evidence, the circumstantial evidence of acquiescence becomes irrelevant.

**74.** 573 F.2d 811, 814 ·15 (3rd Cir. 1978) (citations and footnotes omitted). *Accord, Continental Group, Inc. v. Amoco Chem. Corp.,* 614 F.2d 351, 356 57 (3rd Cir. 1980); *Fitzgerald v. Mountain Laurel Racing, Inc.,* 607 F.2d 589, 600 01 (3rd Cir. 1979), *cert. denied,* — U.S. ——, 100 S.Ct. 2927, 64 L.Ed.2d 814 (1980); *A. O. Smith Corp. v. FTC,* 530 F.2d 515, 525 (3rd Cir. 1976); *Delaware River Port Auth. v. Transamerican Trailer Transport, Inc.,* 501 F.2d 917, 919–20 (3rd Cir. 1974).

**75.** *Glasco v. Hills,* 558 F.2d 179, 180 (3rd Cir. 1977).

The district court also concluded that Eli Lilly would suffer irreparable harm if the preliminary injunction were not granted. It noted that Premo was in Chapter XI reorganization in 1973, reported profits of only $2 million in 1978, and is currently being sued by four other pharmaceutical companies for patent infringement. The court reasoned that, inasmuch as Eli Lilly's annual sales of cephalexin exceeded $100 million, "damages could very conceivably run beyond Premo's ability to pay them." [76] Further, the court found that it was common in the pharmaceutical industry for other generic producers to enter the market whenever the patent on a commercially successful drug was challenged. In view of this evidence, the second factor—irreparable injury—also supports the district court's decision. The possibility of harm to other interested persons does not appear to be relevant to the issues in this case. No such person or corporation has been brought to the Court's attention.

The district court concluded that the fourth factor, the public interest, also weighed in favor of Eli Lilly. Although Premo claims that it would serve the public interest by selling cephalexin at a significantly lower price then Eli Lilly, this does not necessarily establish that it would be in the public interest to permit it to do so.

In enacting the patent laws, Congress recognized that it is necessary to grant temporary monopolies on inventions in order to induce those skilled in the "useful arts" to expend the time and money necessary to research and develop new products and to induce them "to bring forth new knowledge." [77] This justification for sacrificing short—term price competition in order to foster creativity and improvement of products in long—run is particularly applicable to the pharmaceutical industry.

As the record in this case indicates, the development and perfection of new drugs frequently requires the devotion of years of research time and the expenditure of millions of dollars. For example, it took Eli Lilly twenty years to develop cephalexin, during which time its investment in research and testing exceeded $10 million. Each year, Eli Lilly spends approximately ten percent of its net sales revenue on research and development; in 1978, such expenditures exceeded $140 million. Unless this type of an investment of human and capital resources is rewarded by some form of patent protection, companies such as Eli Lilly might well choose not to undertake such large expenditures and instead devote themselves to other endeavors. To the extent this occurs, resources would be diverted from activity that is socially beneficial—the development of new drugs. As one commentator has put it, "Viewed in these terms, the patent grant  .  .  .  functions as a means of raising the expected return to be gained from basic drug research sufficiently to overcome the investor firm's risk aversion and induce it to invest additional funds in research instead of alternative investment opportunities such as production process improvement programs, advertising, increased customer service, or the like." [78]

**76.** *Eli Lilly & Co. v. Premo Pharmaceutical Laboratories, Inc.*, Civ. No. 78–2589, slip op. at 26 (D.N.J. filed July 13, 1979).

**77.** *Graham v. John Deere Co.*, 383 U.S. 1, 9, 86 S.Ct. 684, 689, 15 L.Ed.2d 545 (1966). The Constitution provides Congress the power "[t]o promote the Progress of Science and the useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art. I, § 8, cl. 8. The current patent laws accord the patentee, his heirs, or assigns, the exclusive right to manufacture, to use, or to sell the patented items for a period of seventeen years. 35 U.S.C. § 154 (1976).

**78.** Note, *supra* note 39, at 619 n.54.
Long–term investment in research and development is the primary means by which a highly industrialized economy such as ours continues to grow, to maintain its share of international trade, and thereby to provide employment for its citizens. One observer has defined the dangers of diminishing investment in the inventive and innovative arts in the following terms:
Research and development is by definition a long–range thing. The gestation period of an idea from cerebral conception to profit–making reality is from five to 20 years. Furthermore, not every idea is brought to economic fruition. For every one that does make it to the marketplace, 99 wither along the way,

Thus, Premo's claim that the public interest would be served by permitting it to enter the cephalexin market and sell at a lower price than currently offered by Eli Lilly is contrary to Congress' purposes in enacting the patent laws. Although companies such as Premo, which do not engage in significant amounts of research and development, consequently might be able to undercut the prices offered by pharmaceutical manufacturers that devote large sums to invention and product improvement, this type of short–term competition does not, at least in the considered opinion of the Congress, serve the public interest. Instead, Congress has determined that it is better for the nation in the long–run to afford the inventors of novel, useful, and nonobvious products short–term monopolies on such products than it is to permit free competition in such goods. Therefore, the fourth factor–whether the public interest would be better served by denying or granting the preliminary injunction–also supports the district court's decision.

In sum, all three considerations pertinent to the decision of the district court to grant the preliminary injunction, weigh in favor of that result. Eli Lilly has demonstrated a high probability of success on the merits, the record indicates that Eli Lilly would be irreparably harmed were the preliminary injunction not issued, and the decision to grant the preliminary injunction would serve the public interest as it has been defined by Congress. Accordingly, we hold that the district court did not abuse its discretion in preliminarily enjoining Premo from manufacturing or selling cephalexin on the domestic market.

## CONCLUSION

The judgment of the district court will be affirmed.

## APPENDIX

The common structural characteristic of all cephalosporins is the nucleus, which consists of a 4–membered beta–lactem ring fused to a 6–membered thiazine ring with a double bond between the 3– and 4–positions:

The various cephalosporins differ from one another in the type of side chain attached to the 7–position and in the type of substituent attached to the 3–position.

Thus, cephaloglycin possesses an acetoxymethyl group, which is attached to the 3–position of the nucleus:

oftentimes after years of research and expense that must be written off.

Yet despite these slim chances of success, American industry has willingly invested its corporate profits in R&D, and with good reason: In times of economic stability, the risks were considered reasonable, and the investments turned handsome profits. It was simply a matter of good business sense, the happy consequence of which was a national industry, technology, society and wealth that became the envy of the world.

In times of double–digit inflation such as these, however, that very same good business sense looks for other ways to invest its capital for maximum growth. Long–range investments in R&D are no longer attractive when inflation chomps away at any potential return. Thus American business hedges, growing not by expansion through the development of innovative products but by merger and acquisition.

Letter from A. J. Scarpellino, Jr., senior engineer at the Inco Research and Development Center, Sterling Forest, N. Y. to the editor of the New York Times, N. Y. Times, June 20, 1979, § A at 22, col. 3.

In contrast, cephalexin possesses a plain methyl group attached to the 3–position:

It is this structural change that produces the pharmacological differences between the two compounds.